UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

STARLITE JONES,

    Plaintiff,

v.       CAUSE NO. 3:24cv255 DRL

ZIMMER, INC. d/b/a ZIMMER BIOMET,

    Defendant.

OPINION AND ORDER

Following her termination from Zimmer, Inc. d/b/a Zimmer Biomet, Starlite Jones filed a charge with the Equal Employment Opportunity Commission and then this suit. She alleges race discrimination, a race-based hostile work environment, and retaliation, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Zimmer requests summary judgment on all claims. The court grants the motion.

BACKGROUND

The summary judgment record establishes the following facts, as viewed in the light most favorable to Ms. Jones.[1] *See Lauth v. Covance, Inc.*, 863 F.3d 708, 710 (7th Cir. 2017). Zimmer provides implants and digital and robotic solutions for joint replacement surgeries [28-3 ¶ 1]. Zimmer hired Ms. Jones on July 20, 2022. She began working on August 8, 2022 as a sales support

---

[1] Ms. Jones's response violated Local Rule 56-1. Her brief contains a "statement of disputed facts" that lacks numbered paragraphs, does not cite—much less contain verbatim responses—to Zimmer's statement of material facts, and mixes factual assertions with legal argument in narrative form, complicating the tasks of Zimmer and the court. *See* N.D. L.R. 56-1(b)(2); *1st Source Bank v. Vill. of Stevensville*, 947 F. Supp.2d 934, 937 (N.D. Ind. 2013) (citing *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006)) ("The purpose of Rule 56-1 is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments."). Because she doesn't properly dispute Zimmer's factual assertions, the court treats those as undisputed today in lieu of striking the submissions. Fed. R. Civ. P. 56(e)(2); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

operator [*id.* ¶ 5; 28-1 Tr. 66, 68, 74].[2] Her responsibilities included clerical duties, customer service, and working with joint replacement parts by performing tasks like blasting, cleaning, measuring, and searching for defective parts [28-1 Tr. 68-69]. She was the only black employee working in the area [34-1 ¶ 3]. Her work area was relatively small, with three machines and one desk [*id.* Tr. 72-73]. In the area, desks and tools aren't assigned—all were shared among employees [*id.* Tr. 79-80]. After Ms. Jones was hired, Lena Tabb and someone named Mark (last name unknown) trained her for three or four weeks [*id.* Tr. 76]. Ms. Tabb is white [34-1 ¶ 8]. During her employment, John Croy supervised Ms. Jones [28-1 Tr. 73]. In the beginning, Ms. Jones had no problems with Mr. Croy or other supervisors [*id.* Tr. 77-78].

Initially, Ms. Jones and Ms. Tabb "w[ere] cool," and Ms. Jones thought of Ms. Tabb as a friend [*id.* Tr. 132; *see* 34-1 ¶ 5]. They discussed personal problems and issues, and Ms. Jones checked up on her [28-1 Tr. 132-35]. But Ms. Jones thinks Ms. Tabb became jealous of Ms. Jones after Zimmer's "big bosses" came for an important meeting, and Ms. Jones spoke on how helpful Mr. Croy had been to her after her hiring, which led to Mr. Croy receiving a monetary award [*id.* Tr. 132]. Ms. Jones also said she and the "big boss" "clicked," talking and laughing together [*id.* Tr. 133]. Ms. Jones couldn't recall when this meeting occurred [*id.*].

On December 7, 2022, Mr. Croy held a coaching session with Ms. Jones [28-3 ¶ 6; 28-4 at 3]. "Coaching" isn't formal discipline, but a step in Zimmer's "progressive discipline policy" [34-3 at 19]. During this meeting, Mr. Croy coached Ms. Jones about "creating a hostile work environment by confronting employees directly with issues before reporting to supervisor" and

---

[2] Ms. Jones submitted an affidavit that lists her dates of employment from January 2020 to January 18, 2022 [34-1 ¶ 2]. Given the dates within the record, these dates are impossible, and the court views these as scrivener's errors.

"respecting personal space and maintaining professional atmosphere while at work" [28-4 at 3]. The meeting followed a report Ms. Tabb made to Mr. Croy on December 6, 2022 that Ms. Jones directly approached and confronted her about workstations being left messy and that Ms. Jones hugged another employee, Marc Nellans, which made him feel uncomfortable [*id.*]. Ms. Tabb apparently believed Ms. Jones was creating a hostile work environment [*id.*]. Mr. Nellans reported to other individuals the touching "made him feel uncomfortable" and that Ms. Jones "was invading his personal space" [*id.* at 7, 30].

After their meeting, Ms. Jones requested a follow up with Mr. Croy and also to let him know she reached out to a Zimmer human resources representative, Jen Hlutke [28-1 Tr. 93-96; 28-2 at 4]. In her meeting with Ms. Hlutke, Ms. Jones said she was being intimidated, harassed, and bullied by Ms. Tabb; and, because Ms. Tabb had worked there for longer, Ms. Jones's version of the messy workspace incident was "being overlooked" [28-1 Tr. 97]. Ms. Jones didn't say she believed Ms. Tabb was harassing or bullying her based on her race or color [28-3 ¶ 7].

In her next meeting with Mr. Croy, Ms. Jones again expressed she felt her side of the story wasn't being considered [28-4 at 7]. Mr. Croy told her she hadn't ever come to him with any problems before, and Ms. Jones conceded not doing so was a mistake and that she would do so going forward [*id.*]. Mr. Croy documented that Ms. Jones thanked him and seemed to leave the conversation happy [*id.*]. Ms. Jones didn't express any feelings of being treated differently based on her race or color in this meeting either [*id.*; 28-3 ¶ 8].

As 2023 began, Ms. Jones reported issues with Ms. Tabb to Mr. Croy. On January 24, 2023, she texted Mr. Croy that she believed Ms. Tabb took and hid a cart she needed for work to pick on her and get a reaction [28-1 Tr. 101-03; 28-2 at 6-8]. Ms. Jones acknowledged she

3

didn't actually see Ms. Tabb place the cart where Ms. Jones later found it and there were other carts available for her use [28-1 Tr. 104-06, 114]. Ms. Jones told Mr. Croy she wasn't at ease with Ms. Tabb's behavior or why Ms. Tabb was attacking her indirectly [28-2 at 8]. Mr. Croy told Ms. Jones he would raise the matter with other supervisors [*id.*]. Ms. Jones made no mention of her race as a motivation for Ms. Tabb's conduct [*id.* at 6-8]. Ms. Jones said around this time, supervisors spoke to Ms. Tabb about her conduct [28-1 Tr. 114].

The next issues arose in early February 2023. Ms. Jones contacted Skip Smythe, another supervisor, to discuss problems regarding a chair and a fan [28-1 Tr. 123-25; 28-2 at 9]. Ms. Jones reported someone took a chair that she had been sitting in for eight months and wrote "chemical etch chair" on it [28-1 Tr. 124-25; 28-2 at 11-12]. Ms. Jones says she saw Ms. Tabb take the chair but not write on it [28-1 Tr. 125]. Ms. Jones testified chairs weren't assigned and were for everyone to use, and there were other chairs available [*id.* Tr. 125-127]. A supervisor spoke to Ms. Tabb about this [*id.* Tr. 125-126]. Next, Ms. Jones reported someone damaged her personal fan to the point it was no longer usable [28-1 Tr. 127-28; 28-2 at 12]. She said she doesn't know who did it and doesn't have any proof it was Ms. Tabb [28-1 Tr. 129; 28-2 at 12].

Mr. Croy met with Ms. Jones on February 7, 2023 to discuss these incidents [28-4 at 7]. Mr. Croy told Ms. Jones he would raise the issues with other supervisors so they could be addressed, which led to another meeting later the same day [*id.*; 28-3 ¶ 9; 28-4 at 11]. In that meeting, supervisors assured Ms. Jones they would talk to employees, including Ms. Tabb, about the issues raised [28-4 at 11].

The next day, Ms. Jones emailed Ms. Htulke in human resources and requested a meeting because she felt like she was being bullied and retaliated against [28-2 at 16]. She said an employee

was intimidating, harassing, and taunting her indirectly, and it "appear[ed] to be racist and unfair" [*id.*]. Ms. Jones testified she was referring to Ms. Tabb and supervisors [28-1 Tr. 147]. She said she felt there were racist supervisors who took Ms. Tabb's side and not hers regarding the messy work area incident because "[Ms. Tabb's] color and [Ms. Jones's] color and [Ms. Tabb] had been there 18 years and she was their friend" [*id.*]. When asked why she believed her treatment was because of her race, Ms. Jones testified it was based on her opinion and because she was never asked for her side of the story [*id.* 148].

At Zimmer's request, Ms. Jones prepared a written statement outlining her concerns, which included incidents previously discussed and also that Ms. Tabb was talking about Ms. Jones behind her back, tools went missing in Ms. Jones's work area, Ms. Tabb was giving Ms. Jones dirty looks, Ms. Tabb was putting Ms. Jones's name on hold orders (meaning they couldn't go out until Ms. Jones approved them), and Ms. Tabb previously made racist comments about her to another employee [28-1 Tr. 156-57; 28-2 at 11-12]. Specifically, she said Ms. Tabb told another employee "he likes some coffee," in reference to Ms. Jones [28-2 at 12].[3] She testified she didn't see who took the tools from her work area or who put the orders on hold, but she believed Ms. Tabb was responsible for both without elaborating on why [28-1 Tr. 158].

On February 9, 2023, Ms. Jones texted Mr. Croy informing him that she overheard Ms. Tabb talking negatively about her to other employees, but she didn't want anything to come of it and she would just "let it go" [28-1 Tr. 136; 28-2 at 10]. Ms. Jones and Mr. Croy had another coaching session on February 15, 2023 to discuss Ms. Jones's production output [28-4 at 7].

---

[3] Zimmer investigated this by interviewing Ms. Jones, Ms. Tabb, and Mr. Nellans (to whom Ms. Tabb made the comment) [28-4 at 31]. Zimmer concluded "[Ms. Tabb] may not like her teammate, but it is not based on race but on personality" [*id.*]. Ms. Tabb was coached on avoiding comments that may be interpreted as racially related [*id.*].

5

Next, on February 16, 2025, Ms. Jones reported to Mr. Croy that, while leaving work the previous day, she received a racially derogatory text message from a phone number she didn't recognize [28-1 Tr. 176]. The message read "Black is not queen just a b**** being a n*****" [28-2 at 21]. That day, Ms. Jones wore a shirt that said "Black Queen" [*id.* 22]. A few hours later, she received another message from the phone number saying "That came from Natasha and Jeanine" [28-4 at 16]. Ms. Jones said she didn't know who sent the messages, but surmised it was from a text message generating app, without a clear reason for her thinking [28-1 Tr. 176-77]. She reported the messages first to the police then to Mr. Croy and human resources [*id.* 177; 28-4 at 13]. She assumed Ms. Tabb sent the messages [28-4 at 13]. Ms. Hlutke investigated the text messages and whether Ms. Tabb could have sent them [28-3 ¶ 12]. She found the timing didn't correspond to Ms. Tabb's scheduled break or meal periods and she couldn't determine who was responsible [*id.*]. Ms. Jones testified it was common for employees to look at and use their phones to text on the production floor while working [34-1 ¶ 11].

On March 11, 2023, Ms. Jones and Ms. Tabb got into an altercation, with three different people offering a perspective as to what happened [*see* 28-3 ¶ 13; 28-4 at 18-19]. As detailed by Mr. Croy, Ms. Jones said she was walking by Ms. Tabb's work area when Ms. Tabb pushed a cart into Ms. Jones's stomach [28-4 at 18]. Ms. Jones told Ms. Tabb everyone is teaming up against her, and Ms. Tabb seemed "untouchable" [*id.*]. Another employee, David Lowman, began filming on his phone because he felt it was a hostile environment and no supervisors were present, which also angered Ms. Jones because she hadn't given him permission to film her [*id.* 18-19]. According to Ms. Tabb, who spoke to another supervisor, Ms. Jones pushed a bench into her when cutting through an area between Ms. Tabb's desk and a machine [*id.* 19]. Ms. Tabb pushed the bench

6

back into place, and in doing so the bench hit Ms. Jones [*id.*]. The two exchanged words. Ms. Jones kept referring to her as "little baby girl" [*id.*]. According to Mr. Lowman, the argument began when Ms. Jones attempted to maneuver through Ms. Tabb's workspace, but Ms. Jones's shirt got caught on the corner of the bench [*id.*].

Ms. Hlutke investigated the incident and suspended Ms. Jones in the meantime [28-3 ¶ 14-16]. Ms. Tabb wasn't suspended because the company said she hadn't aggressively participated [*id.* ¶ 14]. As part of her investigation, Ms. Hlutke collected a written statement from Ms. Jones [28-4 at 22-23], interviewed Mr. Lowman [*id.* 24-25] and Ms. Tabb [*id.* 26-28], and reviewed Mr. Lowman's video footage [28-3 ¶ 15]. Ms. Hlutke concluded that on her way back to her workstation, Ms. Jones "inadvertently pushed the workbench with her body into another team member who was working at the workbench. The team member responded by catching the workbench and pushing it back into place as she was standing in front of it" [*id.* ¶ 16; 28-4 at 31]. She found Ms. Jones was "yelling loudly" and was "visibly frustrated and agitated" during the altercation, whereas Ms. Tabb "[held] her hands up in a defensive manner" [28-3 ¶ 17].

Ms. Hlutke recommended terminating Ms. Jones because her conduct violated Zimmer's Team Member Responsibility Policy that prohibits "fighting, assaulting, threatening, or intimidating a fellow Team Member, Customer, supplier, or Zimmer Biomet Guest" and that Ms. Jones has previously been coached for directly confronting team members with issues before reporting the issues to supervisors [*id.* ¶ 17-18; 28-4 at 33, 35-36]. Supervisors agreed, and Zimmer terminated Ms. Jones on March 14, 2023 [*id.*].

STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in her favor. *Beardsall v. CVS Pharm., Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp./Nichols-Homeshield*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor is the court "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920. The court must grant summary judgment when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

Ms. Jones brings claims under Title VII. This statute makes it "an unlawful employment practice for an employer…to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race."

8

42 U.S.C. § 2000e-2(a)(1); *see also Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308 (2025). The law also forbids employers from permitting a hostile work environment on the basis of race. *See Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1118 (7th Cir. 2022). An employer may not retaliate against employees who oppose workplace discrimination. 42 U.S.C. § 2000e-3(a).

A. *Discrimination in Ms. Jones's Termination.*

Ms. Jones first brings a Title VII claim for discrimination in her termination. She alleges she was singled out for punishment after the conflict with Ms. Tabb, while Ms. Tabb—who is white—wasn't similarly punished. The question at summary judgment is whether the evidence, considered as a whole, would permit a reasonable factfinder to conclude Ms. Jones's race caused her termination. *See Galvan v. Indiana*, 117 F.4th 935, 939 (7th Cir. 2024); *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Because evidence of overt discrimination can be rare, answering this question often requires the court to evaluate the "genuineness" of an adverse employment decision, but not the "wisdom of the decision." *Galvan*, 117 F.4th at 939.

Ms. Jones can show discrimination under Title VII with direct evidence or circumstantial evidence, such as suspicious timing, ambiguous statements of animus, proof that other employees were treated differently, or evidence the employer's stated reason for the adverse employment action was pretextual. *Id.* If she chooses, she can also rely on a well-worn burden-shifting framework. *Id.*; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, she must make out a *prima facie* case of discrimination, at which point the burden shifts to Zimmer to offer a nondiscriminatory motive for its employment decision (the so-called adverse action). *Igasaki v. Ill Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). If Zimmer succeeds, the burden returns to Ms. Jones to show the stated reason was pretextual. *Id.*

9

Ms. Jones invokes only the burden-shifting framework. Thus, to prevail, she must put forth evidence that (1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably. *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). Zimmer first argues Ms. Tabb isn't a proper comparator because their respective conduct is distinguishable.

A similarly situated employee "must be directly comparable in all material respects." *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017) (quotations omitted); *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 369 (7th Cir. 2019) ("As [the plaintiff] has not identified any similarly situated employees to allow a factfinder to conduct a meaningful comparison, his prima facie case for discrimination fails") (quotations omitted). The aim is "to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *McDaniel*, 940 F.3d at 368 (quotations omitted). Ms. Jones must show at a minimum the comparator "(1) dealt with the same supervisor, (2) [was] subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them," though this isn't a "hard and fast test." *Id.* at 369.

"Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *Id.* The critical question is whether Ms. Jones has shown that she would have kept her job, had she not been a member of the protected class, if

"everything else had remained the same." *Ortiz*, 834 F.3d at 764. The analysis requires a "common-sense examination." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013). Ms. Jones proposes a single comparator: Ms. Tabb.[4] Ms. Jones argues Ms. Tabb is an apt comparator because both women were involved in the altercation and received coaching in the past. Of the *prima facie* elements, Zimmer challenges only that the two are not similarly situated.

It is undisputed that Ms. Tabb is white, performed the same tasks as Ms. Jones, and both were involved in the altercation [28-1 Tr. 106; 34-1 ¶ 8]. Though Zimmer's investigation concluded Ms. Jones was the more aggressive participant, "[t]he similarly-situated inquiry is about whether employees are *objectively* comparable." *Coleman v. Donahoe*, 667 F.3d 835, 852 n.5 (7th Cir. 2012). Though in terminating Ms. Jones, Zimmer also referenced her previous instances of coaching in regard to her conduct towards other employees [28-4 at 33], Zimmer also coached Ms. Tabb "on avoiding any comments that may be interpreted as racial related" [*id.* 31]. "Enough common factors" exist to permit a reasonable jury to find "meaningful comparison" between Ms. Jones and Ms. Tabb. *Id.* at 847; *see Gordon v. United Airlines, Inc.*, 246 F.3d 878, 891 (7th Cir. 2001) ("It is not the province of this court to question an employer's decision to punish some conduct more harshly than other conduct. Nevertheless, we are not bound by the labels that an employer uses and must scrutinize the conduct behind those labels to determine if they are applied to similar conduct."); *see also Coleman*, 667 F.3d at 846 ("We are looking for comparators, not clones.") (cleaned up).

---

[4] In her response brief, Ms. Jones also mentions Mr. Lowman and that he wasn't disciplined for filming the alternation between the other two, though the crux of her argument posits only Ms. Tabb as a proper comparator. Mr. Lowman could not be considered a comparator by a reasonable jury.

11

But Ms. Jones falters at the final step of this *McDonnell-Douglas* framework. Zimmer says it fired Ms. Jones based on her workplace conduct. Thus, the burden returns to Ms. Jones to show Zimmer's proffered rationale for terminating her employment is just pretext for discrimination. "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Brooks v. City of Pekin*, 95 F.4th 533, 539 (7th Cir. 2024). Thus, "it is of no moment if the employer's reasoning is incorrect, foolish, trivial or even baseless," *Brooks v. Avancez*, 39 F.4th 424, 436 (7th Cir. 2022) (quotations omitted), because "what ultimately matters is causation: the plaintiff must point to evidence that would allow a jury to find a connection between the statutorily protected factor (here, race) and the adverse action," *Grove v. S. Bend Cmty. Sch. Corp.*, 51 F.4th 766, 770 (7th Cir. 2022); *see Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 744 (7th Cir. 2022) ("arguing about the accuracy of the employer's assessment is a distraction…because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*.") (quotations omitted).

Zimmer says it terminated Ms. Jones's employment after determining she initiated and acted more aggressively during the altercation with Ms. Tabb and because Zimmer previously coached her on her conduct toward other employees [28-3 ¶ 16-18; *see* 28-4 at 33]. Ms. Jones disagrees with the characterization that she was the more aggressive participant during the altercation, but Zimmer had some basis for reaching this conclusion and debating this without insight into the company's subjective motivation falls short of demonstrating pretext for a reasonable jury. *See Liu v. Cook Cnty.*, 817 F.3d 307, 318 (7th Cir. 2016) (courts "do not sit as super-personnel department[s], examining the wisdom of employers' business decisions."); *Coleman*, 667 F.3d at 852 n.5 ("pretext inquiry hinges on the employer's *subjective* motivations.").

12

The record is entirely devoid of any evidence from Ms. Jones that Zimmer lied or disassembled in the reasons it gave for her termination or, in doing so, that the company covered up discriminatory motive for her termination.

Ms. Jones has not argued her case holistically; but, even through this lens, a reasonable jury could not find that Zimmer terminated her employment because of racial animus. She has no direct evidence of racial animus. To the extent that this might appear, say inferentially in a single comment made by Ms. Tabb, there is no direct or circumstantial evidence that would permit a reasonable jury to find that this motivated Zimmer. Ms. Tabb was a coworker, not a decisionmaker. And, rather than buy into Ms. Tabb's arguable view, Zimmer was measurably corrective of her prior comment. The company and its management were not disinterested or apathetic ears when complaints came, and each time the company investigated and, when appropriate, addressed concerns. The other evidence of racism—the texts from an unknown sender—could not be attributed to a particular person. Going one step further, no reasonable jury could attribute them as reflective of some animus by the company. That would be pure guesswork. Ms. Jones might be able to demonstrate that Zimmer treated Ms. Tabb differently in both Ms. Jones's suspension pre-investigation and termination post-investigation of the altercation, but a reasonable jury could not find the company did so because of racial animus. The court grants summary judgment on the Title VII discrimination claim accordingly.

B. *Hostile Work Environment.*

Ms. Jones also brings a race-based hostile work environment claim. "A work environment is hostile under Title VII when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

13

employment and create an abusive working environment." *Scaife*, 49 F.4th at 1115 (quotations omitted). Ms. Jones must establish "(1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Id.* at 1115-16. Zimmer argues Ms. Jones's claim fails on the second, third, and fourth prongs. The court finds the fourth element dispositive, so the discussion begins and ends there.

Different standards apply in evaluating an employer's liability for a hostile work environment depending on whether the alleged harasser is a coworker or a supervisor. *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813 (7th Cir. 2022). No party argues Ms. Tabb was at any point Ms. Jones's supervisor. Thus, because Ms. Jones alleges coworker harassment, Zimmer "is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). This includes acting negligently "either in discovering or remedying the harassment." *Paschall*, 28 F.4th at 813. "An employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees." *Id.* (citation omitted).

At the start, as Zimmer points out, Ms. Jones offers no response to the argument on employer liability. In her response, she addresses only whether the environment was subjectively and objectively hostile. Arguments not developed in opposition to summary judgment are waived. *Nichols v. Mich. City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014) ("non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment"); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to

14

respond to an argument—as the [plaintiffs] have done here—results in waiver."). Ms. Jones has not given the court a basis for making this finding on her behalf.

That said, even crediting her account of a hostile environment, the undisputed record won't support a finding that Zimmer acted negligently in discovering or remedying her reports. "A prompt investigation is the hallmark of a reasonable corrective action." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) (quotation omitted). In assessing an employer's response, the court's "focus is not whether the perpetrators were punished by the employer, but whether the employer took reasonable steps to prevent future harm." *Id.* at 637; *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 536 (7th Cir. 1993).

Here, each time Ms. Jones made a report, Zimmer acted. When Ms. Jones complained to Mr. Croy, he spoke with Ms. Jones, relayed concerns to other supervisors, and assured Ms. Jones they would raise the issues with Ms. Tabb and other employees. Supervisors coached Ms. Tabb on avoiding making comments that may be interpreted as racially related. Zimmer investigated Ms. Jones's various other allegations—including those involving the chair and fan—and concluded they were unsubstantiated and otherwise explainable. After Ms. Jones reported the text messages, Ms. Hlutke investigated but could not determine their sender. Finally, after the altercation, Mr. Croy instructed Ms. Jones to leave work and remove herself from the situation and the company again investigated in full.

Though Ms. Jones may view Zimmer's steps as ineffective, an employer must only respond reasonably, and "a response may be so calculated even though the perpetrator might persist." *Porter*, 576 F.3d at 637. Here, Zimmer repeatedly found many of the allegations—including those involving the chair, the fan, and the text message—were based only on Ms.

Jones's speculation that Ms. Tabb was responsible. No reasonable jury could find that conclusion unreasonable. Even still, Zimmer told Ms. Jones it would discuss her concerns with Ms. Tabb and other employees as well. With the inconclusive nature of these findings, it is difficult to imagine what additional remedial action could be expected. In another instance, where conduct could be addressed (the "coffee" remark), Zimmer coached Ms. Tabb on avoiding making racial comments. Nothing in the record suggests Zimmer ignored complaints, failed or delayed investigation, or otherwise failed to implement corrective steps. *See Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 699 (7th Cir. 2014) ("Title VII requires only that employers take action reasonably calculated to stop unlawful harassment; that requirement does not necessarily include disciplining the employees responsible for past conduct."). Accordingly, because no reasonable jury could find that Zimmer negligently responded to Ms. Jones's complaints and because she has declined to respond to the argument on that front, the court grants summary judgment on the hostile work environment claim.

    C. *Retaliation.*

Finally, Ms. Jones brings a retaliation claim. She argues Zimmer terminated her in retaliation for reporting the racist text message. Title VII prohibits retaliation against an employee "because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). The purpose of this anti-retaliation provision is to "prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms…by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337,

16

346 (1997)). This prohibition "cover[s] a broad range of employer conduct." *Thompson v. N. Am. Stainless, L.P.*, 562 U.S. 170, 173 (2011). The pertinent inquiry is whether an employer has acted in a way that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 174 (citation omitted).

An employee may make out a Title VII retaliation claim via either the direct or indirect method of proof. *See Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018); *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). Ms. Jones pursues only the direct method here; but, either way, the court must analyze the evidence as a whole to determine "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected activity] caused the…adverse employment action." *Ortiz*, 834 F.3d at 765.

Ms. Jones must show that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) a causal connection existed between the two. *See Runkel v. City of Springfield*, 51 F.4th 736, 746 (7th Cir. 2022). The parties leave the first two prongs alone and argue causation alone. "A causal link requires more than the mere fact that an employer's action happens after an employee's protected activity." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016). Ms. Jones may argue causation circumstantially. *See Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). This can include suspicious timing, ambiguous statements of animus, evidence similarly situated colleagues were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual. *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015).

Though courts have found a month short enough to bolster an inference of retaliation, *see Magyar v. Saint Joseph Regional Medical Center*, 544 F.3d 766, 772 (7th Cir. 2008); *Boumehdi v. Plastag*

*Holdings, LLC*, 489 F.3d 781, 786-87, 793 (7th Cir. 2007), even still, to survive summary judgment, Ms. Jones must offer more evidence supporting the inference of a causal link between the two events than simply close temporal proximity, *see Muhammad*, 767 F.3d at 701 ("mere temporal proximity is rarely sufficient"); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) (though "[t]here is no bright-line rule as to the amount of evidence necessary to survive summary judgment under the direct method,…it is clear that mere temporal proximity is not enough to establish a genuine issue of material fact."); *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) (plaintiff "needs more than a coincidence of timing to create a reasonable inference of retaliation"); *see also Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (noting it is a "rare occasion[]" for suspicious timing alone to establish causation).

Ms. Jones's evidence of a causal connection is limited to the supposed temporal proximity between her reporting of the text messages and her subsequent termination. But, in the end, it proves entirely speculative. She posits a jury could infer her report of the text message on February 16, 2023 proved too much for Zimmer to continue to be bothered by her reports and disputes with Ms. Tabb, thus Zimmer took Ms. Tabb's side based on her race and terminated Ms. Jones on March 14, 2023. But even reading the record in the light most favorable to Ms. Jones, her argument amounts to an invitation for the court to permit a jury to find causation from layering one speculative view—that Zimmer grew tired of her conflict with Ms. Tabb and chose Ms. Tabb's side—onto the inference of suspicious timing. *See Igasaki*, 98 F.3d at 961 ("a speculative inference does not an employment discrimination case make."); *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) ("our favor toward the non-moving party does not extend to drawing inferences that are supported by only speculation or conjecture").

The record is clear that, between Ms. Jones's complaint and her termination, Zimmer determined she was more seriously involved in the altercation with Ms. Tabb; and, even before she reported the text message in February 2023, Mr. Croy coached Ms. Jones on her conduct toward other employees. Rather than permit an inference of causation, the record presents counter-evidence of it. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) ("where a significant intervening event separates an employee's protected activity from the adverse employment action [s]he receives, a suspicious-timing argument will not prevail") (quotations and alterations omitted); *see also Lauth v. Covance, Inc.*, 863 F.3d 708, 717 (7th Cir. 2017) (plaintiff's "own speculation" that supervisors' concerns were mistaken or misplaced insufficient to establish causation because in context of retaliation claim, "judgments regarding the fairness of a particular action or the accuracy of an employer's belief about an employee's job performance have no place in determining whether the employer acted based on an improper motive"); *Morgan v. SVT, LLC*, 724 F.3d 990, 998 (7th Cir. 2013) ("where, as here, there are reasonable, non-suspicious explanations for the timing of [the plaintiff's] termination…we will not deny summary judgment solely on the strength of [suspicious timing]."). Because no reasonable jury could find a causal connection between Ms. Jones's report of the text message and her termination, the court grants summary judgment for Zimmer on the retaliation claim.

## CONCLUSION

Accordingly, the court GRANTS the summary judgment motion [26], DIRECTS entry of judgment for Zimmer, Inc. d/b/a Zimmer Biomet, and VACATES the trial date of April 21, 2026 and the final pretrial conference date of April 6, 2026. This order terminates the case.

SO ORDERED.

December 19, 2025                            *s/ Damon R. Leichty*
                                                       Judge, United States District Court